**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re: | : Bankruptcy No. 19-11395-JKF |
| Julie E. Strefeler | : Chapter 13 |
| Debtor | : |
| | : |
| MTGLQ Investors, LP c/o Rushmore Loan | : |
| Management Services, LLC | : |
| Movant | : |
| vs. | : |
| | : |
| Julie E. Strefeler and James M. Strefeler (Non- | : |
| Filing Co-Debtor) | |
| Debtors/Respondents | : |
| and | : |
| Scott F. Waterman, Esquire | : |
| Trustee/Respondent | : |

## MOTION FOR RELIEF FROM AUTOMATIC STAY AND CO-DEBTOR STAY UNDER 11 U.S.C. § 362 AND §1301

Movant, by its Attorneys, Hladik, Onorato & Federman, LLP, hereby requests a Termination of the Automatic Stay and leave to proceed with its State Court rights provided under the terms of the Mortgage.

1.      Movant is MTGLQ Investors, LP c/o Rushmore Loan Management Services, LLC ("Movant").

2.      Debtor, Julie E. Strefeler ("Debtor") and James M. Strefeler ("Non-Filing Co-Debtor") are the owners of the premises located at 66 Rocky Ridge Road, Quakertown, PA 18951 (the "Property").

3.      Scott F. Waterman, Esquire is the Trustee appointed by the Court.

4.      Debtor filed a Petition for Relief under Chapter 13 of the Bankruptcy Code on March 6, 2019.

5.      Movant is the holder of a mortgage lien on the Property in the original principal amount of $265,000.00, which was recorded on March 11, 2008 (the "Mortgage"). A true and correct copy of the Mortgage is attached hereto as Exhibit "A."

6.      The Mortgage was assigned to Movant by way of a series of written assignments, the last of which was recorded on August 9, 2017. A true and correct copy of the assignment of mortgage is attached hereto as Exhibit "B."

7.      Movant has not received the monthly post-petition Mortgage payments from July 1, 2019 through January 1, 2020 in the amount of $1,303.89 each, plus February 1, 2020 through March 1, 2020 in the amount of $1,369.36 each. Plus, attorney fees and costs for this motion in the amount of $1,231.00, for a total post-petition arrearage of $13,096.95.

8.      Movant has cause to have the Automatic Stay terminated, in order to permit Movant to complete foreclosure on its Mortgage.

**WHEREFORE,** Movant respectfully requests that this Court enter an Order:

a.      Modifying the Automatic Stay and Co-Debtor Stay under 11 U.S.C. § 362 and §1301 of the Bankruptcy Code with respect to the Property as to permit Movant to foreclose on its Mortgage and allow Movant or any other purchaser at Sheriff's Sale to take legal or consensual action for enforcement of its right to possession of, or title to; and

b.      Granting any other relief that this Court deems equitable and just.


Respectfully Submitted,

Date: 03/09/2020                     /s/Danielle Boyle-Ebersole, Esquire
                                     Danielle Boyle-Ebersole, Esquire
                                     Hladik, Onorato & Federman, LLP
                                     298 Wissahickon Avenue
                                     North Wales, PA 19454
                                     Phone 215-855-9521/Fax 215-855-9121
                                     debersole@hoflawgroup.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re: | : Bankruptcy No. 19-11395-JKF |
| Julie E. Strefeler | : Chapter 13 |
| Debtor | : |
| | : |
| MTGLQ Investors, LP c/o Rushmore Loan | : |
| Management Services, LLC | : |
| Movant | : |
| vs. | : |
| | : |
| Julie E. Strefeler and James M. Strefeler (Non- | : |
| Filing Co-Debtor) | |
| Debtors/Respondents | : |
| and | : |
| Scott F. Waterman, Esquire | : |
| Trustee/Respondent | : |

## CERTIFICATION OF SERVICE OF MOTION, RESPONSE DEADLINE AND HEARING DATE

       I, Danielle Boyle-Ebersole, attorney for Movant, MTGLQ Investors, LP c/o Rushmore Loan Management Services, LLC, hereby certify that I served a true and correct copy of the Motion for Relief from Automatic Stay and Notice of Motion, Response Deadline and Hearing Date, by United States Mail, first class, postage prepaid, or Electronic Mail on 03/09/2020 upon the following:

| | |
|---|---|
| Brad J. Sadek, Esquire | Julie E. Strefeler |
| Via ECF: | James M. Strefeler |
| *Attorney for Debtors* | 66 Rocky Ridge Road |
| | Quakertown, PA 18951 |
| Scott F. Waterman, Esquire | Via First Class Mail |
| Via ECF: | *Debtor and Non-Filing Co-Debtor* |
| *Trustee* | |

Dated: 03/09/2020

                 /s/Danielle Boyle-Ebersole, Esquire
                 Danielle Boyle-Ebersole, Esquire
                 Hladik, Onorato & Federman, LLP
                 298 Wissahickon Avenue
                 North Wales, PA 19454
                 Phone 215-855-9521/Fax 215-855-9121
                 debersole@hoflawgroup.com

# **EXHIBIT A**

## BUCKS COUNTY RECORDER OF DEEDS
### 55 East Court Street
### Doylestown, Pennsylvania  18901
### (215) 348-6209

Instrument Number - 2008022057
Recorded On 3/11/2008 At 11:28:03 AM                    * Total Pages - 19
* Instrument Type - MORTGAGE - CORPORATIONS
Invoice Number - 242156          User - KLJ
* Mortgagor - STREFELER, JAMES M
* Mortgagee - NATIONAL PENN BK
* Customer - PRIDE ABSTRACT & SETTLEMENT
* FEES

| RECORDING FEES | $74.50 |
|----------------|--------|
| TOTAL PAID     | $74.50 |

This is a certification page

# DO NOT DETACH

This page is now part
of this legal document.

RETURN DOCUMENT TO:
PRIDE ABSTRACT & SETTLEMENT

I hereby CERTIFY that this document is
recorded in the Recorder of Deeds Office
of Bucks County, Pennsylvania.

Edward R. Gudknecht
Recorder of Deeds

* - Information denoted by an asterisk may change during
the verification process and may not be reflected on this page.

Book: 5724  Page: 211

Prepared By: **Monique Noll**
      **24 North Reading Avenue**
      **Boyertown, PENNSYLVANIA 19512**

**RECEIVED**

**2008 MAR -3  P 2: 01**

**BUCKS COUNTY
RECORDER OF DEEDS**

Return To:  **National Penn Bank
      24 North Reading Avenue
      Boyertown, PENNSYLVANIA 19512**

Parcel No.: ████████████

———————— [Space Above This Line For Recording Data] ————————

# MORTGAGE

**MIN:** ████████████

B.C.B.O.A.
Registry

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated **February 19, 2008**, together with all Riders to this document.

**(B)** **"Borrower"** is **James M. Strefeler and Julie E. Strefeler**

Borrower is the mortgagor under this Security Instrument.

**(C)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D)** **"Lender"** is **National Penn Bank**
Lender is a
the laws of **PENNSYLVANIA**                       organized and existing under
**24 North Reading Avenue, Boyertown, PENNSYLVANIA 19512**     Lender's address is

**(E)** **"Note"** means the promissory note signed by Borrower and dated **February 19, 2008**. The Note states that Borrower owes Lender **Two Hundred Sixty Five Thousand and no/100**
Dollars (U.S. $**265,000.00**                              )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   **March 01, 2038**

PENNSYLVANIA—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**        **Form 3039 1/01**

MERS
ITEM 2760L1 (0708)                                             GreatDocs™
                                                    (Page 1 of 14)

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] Other(s) [specify] **Legal Description** |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

PENNSYLVANIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

MERS
ITEM 2760L2 (0706)

Form 3039 1/01
GreatDocs™
(Page 2 of 14)

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the **County**

[Type of Recording Jurisdiction]

of            **BUCKS**

[Name of Recording Jurisdiction]

which currently has the address of              **66 Rocky Ridge Road**

[Street]

**Quakertown**              , Pennsylvania              **18951**              ("Property Address"):

[City]                                    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.  Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.  Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower

shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

PENNSYLVANIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
MERS
ITEM 2780L5 (0709)

Form 3039 1/01

GreatDocs ™
(Page 5 of 14)

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.    Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or

**PENNSYLVANIA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
MERS
ITEM 2760L6 (0708)

Form 3039 1/01

GreatDocs™
(Page 6 of 16)

otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.    Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.    Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.   Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)   Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b)   Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

PENNSYLVANIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3039 1/01
MERS
ITEM 2760L8 (0708)                                                                                        GreatDocs™
(Page 8 of 14)

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization

PENNSYLVANIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
MERS
ITEM 2750L9 (0706)

Form 3039 1/01

GreatDocs™
(Page 9 of 14)

of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations

PENNSYLVANIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
MERS
ITEM 2760L10 (0708)

Form 3039 1/01

GreatDocs™
(Page 10 of 14)

contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a

**PENNSYLVANIA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
MERS
ITEM 2760L11 (0708)

Form 3039 1/01

GreatDocs™
(Page 11 of 14)

Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without**

PENNSYLVANIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
MERS
ITEM 2760L12 (0708)

Form 3039 1/01

GreatDocs™
(Page 12 of 14)

further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 14 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

This is a contract under seal and may be enforced under 42 Pa.C.S. Section 5529(b).

_____ (Seal)
James M. Strefeler                     -Borrower

_____ (Seal)
Julie E. Strefeler                     -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

PENNSYLVANIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
MERS
ITEM 2760L13 (0708)

Form 3039 1/01
GreatDocs™
(Page 13 of 14)

State of **PENNSYLVANIA**
County of  Bucks

On this the  **19th**  day of  **February 2008**  , before me,
the undersigned officer, personally appeared **James M. Strefeler, Julie**
**E. Strefeler**

known to me (or satisfactorily proved) to be the person(s) whose name(s) **ARE**
subscribed to the within instrument and acknowledged that  **THEY**  executed the same for the purposes
therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Walter Commiso_

_Agent_

Title of Officer

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Walter Commiso, Notary Public
Hilltown Twp., Bucks County
My Commission Expires Oct. 30, 2008
Member, Pennsylvania Association of Notaries

My commission expires:

CERTIFICATE OF RESIDENCE    I,  Walter Commiso
do hereby certify that the correct address of the within named lender is **24 North Reading Avenue,**
**Boyertown, PENNSYLVANIA 19512**

Witness my hand this  **19th**  day of  **February 2008**

_Walter Commiso_

Agent of Lender

PENNSYLVANIA—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
MERS
ITEM 2760L14 (0708)

**Form 3039 1/01**
GreatDocs™
(Page 14 of 14)

# FIXED/ADJUSTABLE RATE RIDER
### (One-Year Treasury Index—Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **19th**                                    day of
**February 2008**                    , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **National Penn
Bank**

("Lender") of the same date and covering the property described in the Security Instrument and located at:

**66 Rocky Ridge Road
Quakertown, PENNSYLVANIA 18951**

[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE
TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT
BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.    ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of        **6.2500** %. The Note also provides for a
change in the initial fixed rate to an adjustable interest rate, as follows:

## 4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A)  Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of
**March 2013**                    , and the adjustable interest rate I will pay may change on that day every 12th
month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and
each date on which my adjustable interest rate could change, is called a "Change Date."
### (B)  The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The
"Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of
one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the
date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.
### (C)  Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two and
Seven Eighths**
percentage points (        **2.8750** %) to the Current Index. The Note Holder will then round the result of
this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in
Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER—ONE-YEAR TREASURY INDEX**—Single Family—
**Fannie Mae Uniform Instrument**

**Form 3182 1/01**

ITEM 5745L1 (0011)                              *(Page 1 of 3 pages)*

GreatDocs ™
To Order Call: 1-800-968-5775

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.2500 %** or less than **4.2500 %**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest will never be greater than **12.2500 %**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1.    Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.    When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment

sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 3 of this Fixed/Adjustable Rate Rider.

_____ (Seal)
James M. Strefeler                          -Borrower

_____ (Seal)
Julie E. Strefeler                          -Borrower

_____ (Seal)
                                            -Borrower

_____ (Seal)
                                            -Borrower

_____ (Seal)
                                            -Borrower

_____ (Seal)
                                            -Borrower

ITEM 5745L3 (0011)                (Page 3 of 3 pages)

Form 3182 1/01
GreatDocs™
To Order Call: 1-800-968-5775

# EXHIBIT 'A'

ALL THAT THAT CERTAIN messuage and tract of land together with the dwelling now there erected situate in Richland Township, Bucks County, Pennsylvania, more fully described on the Final Plan of Subdivision of lands of Corporation Hilltop as prepared by Urwiler & Walter, Inc., Sumneytown, Pa., dated July 29, 1974, last revised July 25, 1975 and recorded September 11, 1975 in plan Book 137 page 9, more fully bounded and described as follows, to wit:

BEGINNING at a point on the center line of Rocky Ridge Road LR 09114 (ultimate width 50 feet wide) said point being South 07 degrees 32 minutes 30 seconds-East 706.88 feet from the point of intersection of the center line of Rocky Ridge Road, aforesaid with the center line of Paletown Road, LR 09083 (Ultimate width 80 feet wide); thence in and along the said Rock Ridge Road, South 07 degrees 32 minutes 30 seconds East 135 feet to a point; thence leaving the said Rocky Ridge Road, and running along Lot #2 as shown on said plan, South 82 degrees 27 minutes 30 seconds West 399.72 feet to a point in line of lands now or late of Alex Patafta; thence along same North 25 degrees 24 minutes West 12.38 feet to a point a corner of lands now or late of Charles B. Kaniner; thence along same the following two courses and distances: (1) North 39 degrees 11 minutes East 101 feet to a point; (2) North 25 degrees 19 minutes West 56.67 feet to a point a corner of Lot #4 as shown on said plan thence along same and along other lands now or late of Corporation Hilltop, North 82 degrees 27 minutes 30 seconds East 347.27 feet to the point and place of beginning.

BEING Lot #3 as shown on said plan and that portion of the premises lying between Lot #3 and the center line of Rocky Ridge Road.

COUNTY PARCEL NUMBER ███████████

BEING the same premises which Roy Hardwick and Ruth Hardwick, husband and wife, by Deed dated 9/18/1978 and recorded in Bucks County in Deed Book 2303 page 541 conveyed unto James M. Stefeler and Julie E. Strefeler, husband and wife, in fee.

PARCEL ID #: ████████████

AGENCY FILE NUMBER ██████

BB&T Mortgage Loan No: ███████

_____[Space Above this Line for Recording Data]_____

Prepared By: ASHLEY CROWN
Return To: Branch Banking and Trust Co.
301 College St
Greenville SC, 29601

**BB&T Mortgage Loan No-** ███████

### LOAN MODIFICATION AGREEMENT
(Providing for Step Interest Rate)

This Loan Modification Agreement ("Agreement"), is effective December 1, 2016, between JAMES M. STREFELER (Borrower) and JULIE E. STREFELER (Borrower) and Branch Banking and Trust Co. ("Lender"), and amends and supplements (1) the Note made by the Borrower, dated February 19, 2008 in the original principal sum of U.S. $265,000.00 and (2) the Mortgage, Deed of Trust, or Deed to Secure Debt ("the Security Instrument") securing the Note recorded on March 11, 2008 in Instrument #2008022057 in the Office of the Registry of Bucks County. For the purpose of this Agreement, the term "Property" shall be the real property and personal property, if any, together with any improvements located thereon, as more particularly described in the Security Instrument and having an address of:

**66 Rocky Ridge Road**
**Quakertown PA 18951**

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. Borrower hereby acknowledges that prior to this modification the outstanding unpaid principal balance due under the Note and Security Instrument is $226,443.21.

2. The Borrower acknowledges that interest has accrued but has not been paid and the Lender has incurred, paid or otherwise advanced taxes, insurance premiums and other expenses necessary to protect or enforce its interest in the Note and the Security Instrument, and that such interest, cost and expenses, in the total amount of $8,995.75 has been added to the indebtedness under the terms of the Note and Security Instrument, as of December 1, 2016 resulting in a total indebtedness due of U.S. $235,438.96 (the new "Unpaid Principal Balance").

3. The borrower acknowledges that $2,000.00 of the Unpaid Principal Balance shall be Deferred (the "Deferred Principal Balance") as of December 1, 2016. Interest is not charged on the Deferred Principal Balance and no monthly payments will be required towards this amount. The Deferred Principal Balance is not forgiven and is due in full upon the maturity date of December 1, 2056 or at the time of payoff or transfer, whichever is sooner.

BB&T Mortgage Loan No: ▮▮▮▮▮▮

4.  The borrower acknowledges that the interest bearing amount of the Unpaid Principal Balance (the "Interest Bearing Principal Balance"), is U.S. $233,438.96.

5.  Effective December 1, 2016 interest will be charged on the interest bearing portion of the Unpaid Principal Balance for the first 60 months at the annual rate of 2.000% and the borrower promises to pay monthly payments of principal and interest in the amount of $706.91 starting January 1, 2017, and the borrower promises to continue monthly payments in accordance with this agreement thereafter on the same day of each succeeding month until the principal and interest are paid in full.

| Months | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On |
|--------|---------------|---------------------------|-----------------------------------------------|--------------------------------|------------------------|-------------------|
| 1-60 | 2.000% | 12/1/2016 | $706.91 | $559.37 may adjust periodically | $1,266.28 may adjust periodically | 1/1/2017 |
| 61-72 | 3.000% | 12/1/2021 | $821.27 | may adjust periodically | may adjust periodically | 1/1/2022 |
| 73-480 | 3.375% | 12/1/2022 | $865.53 | may adjust periodically | may adjust periodically | 1/1/2023 |

6.  The escrow payments may be adjusted periodically in accordance with applicable law and therefore the total monthly payment may change accordingly.

7.  If on December 1, 2056 (the "Maturity Date"), the borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, the Borrower will pay these amounts in full on the Maturity Date.

**The Borrower will make such payments to and at Branch Banking and Trust Company, Mortgage Payment Center, P.O. Box 580302, Charlotte, NC 28258-0302 or such other place as the Lender may require.**

8.  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in the Borrower is sold or transferred and the Borrower is not a natural person) without the Lender's prior written consent, the Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. If the Lender exercises this option, the Lender shall give the Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If the Borrower fails to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on the Borrower.

9.  The borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, the Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that the Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:

a)  All terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note: and

b)  All terms and provisions of any adjustable rate rider or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security instrument and that contains any such terms and provisions as those referred to in (a) above.

10. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and the Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement.

BB&T Mortgage Loan No:

**(Individual Acknowledgement)**

Witness our hands and seals to this Agreement this _23_ day of _DECEMBER_, 20 _16_.

Witness Signature

Witness Printed Name
Elizabeth Aliotis.

Witness Signature

Witness Printed Name
Nicole Rhinesmith

BY: _____ JAMES M. STREFELER

BY: _____ JULIE E. STREFELER

STATE OF _PA._ )
COUNTY OF _Bucks_ )

I, _SUSAN M. SHAPIRO_, a Notary Public of said county do hereby certify that _JAMES M. STEFELER AND JULIE E. STREFELER_ Borrower(s) personally appeared before me this day and acknowledged the execution of the foregoing AGREEMENT.

The execution thereof SWORN to before me this _23_ day of _DECEMBER_, 20 _16_.

NOTARY PUBLIC FOR STATE OF _PENNSYLVANIA_

My Commission Expires: _1-21-2020_

Notary Public

**COMMONWEALTH OF PENNSYLVANIA**
NOTARIAL SEAL
SUSAN M SHAPIRO, NOTARY PUBLIC
WARRINGTON TWP, BUCKS COUNTY
MY COMMISSION EXPIRES JAN. 21, 2020

Mers No.:
BB&T Loan No.:

JAMES M. STREFELER
JULIE E. STREFELER
66 Rocky Ridge Road
Quakertown PA 18951

## ERRORS AND OMISSIONS
## COMPLIANCE AGREEMENT

In consideration of Branch Banking and Trust Co.(the "Lender") agreeing to modify the referenced loan
(the "Loan") to JAMES M. STREFELER and JULIE E. STREFELER (the "Borrower"), the Borrower
agrees that if requested by the lender, the Borrower will correct, or cooperate in the correction of, any clerical
errors made in any document or agreement entered into in connection with the modification of the Loan, if
deemed necessary or desirable in the reasonable discretion of the Lender, to enable Lender to sell, convey,
seek guaranty or market the Loan to any entity, including without limitation, the Federal National Mortgage
Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association,
the Federal Housing Authority, the Department of Veterans Affairs or any municipal bond authority.

The Borrower agrees to comply with all such request made by the Lender within 30 days of receipt
of written request from the Lender.  Borrower agrees to assume all costs that may be incurred by
the Lender, including without limitation, actual expenses, legal fees and marketing losses, as a
result of the Borrower's failure to comply with all such requests within such 30 day period.

The Borrower makes this agreement in order to assure that the documents and agreements
executed in connection with the modification of the Loan will conform to and be acceptable in the
marketplace in the event the Loan is transferred, conveyed, guaranteed or marketed by the Lender.

JAMES M. STREFELER                                              DATE: 12/23/16

JULIE E. STREFELER                                              DATE: 12/23/16

**BB&T Mortgage Loan No.** ▮▮▮▮▮
(Corporate Acknowledgement)

Witness our hands and seals to this Agreement this _29th_ day of _December_, 2016.

**Branch Banking and Trust Company**

WITNESSED BY:

Printed Name: _Thomas Duncan_

BY: _____

Banking Officer

**GREGORY IZARD**

Printed Name: _Ashley Wallace_

STATE OF <u>South Carolina</u>)

COUNTY OF <u>Greenville</u>)

I, _Kimberly Rachelle McClee_, Notary Public of said County, do hereby
certify _Gregory Izard_ Lender/Note Holder, personally appeared before me this day and
acknowledged that he/she is a Banking Officer of Branch Banking and Trust Co. On behalf of the corporation I
acknowledge the due execution of the foregoing instrument.

SWORN TO BEFORE ME THIS _29th_ day of _December_, 2016.

**KIMBERLY RACHELLE MCCLEER**
Notary Public · State of South Carolina
My Commission Expires October 17. 2026

My Commission Expires: _____

_Kimberly Rachelle McClee_
Notary Public

# EXHIBIT B



# FIXED/ADJUSTABLE RATE NOTE
### (One-Year Treasury Index—Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| **February 19, 2008** | **Wyomissing** | **PENNSYLVANIA** |
|---|---|---|
| [Date] | [City] | [State] |

**66 Rocky Ridge Road**
**Quakertown, PA 18951**

[Property Address]

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $**265,000.00**        (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **National Penn Bank**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  **6.2500**%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.  PAYMENTS

#### (A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on    **April 01, 2008**    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    **March 01, 2038**    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

or at a different place if required by the Note Holder.

#### (B)  Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $**1,631.66**    . This amount may change.

#### (C)  Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

---

**MULTISTATE FIXED/ADJUSTABLE RATE NOTE—ONE-YEAR TREASURY INDEX—**Single Family—
**Fannie Mae Uniform Instrument**

Form 3522 1/01

GreatDocs™
(Page 1 of 5)

ITEM 5746L1 (0711)



**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **March 2013**, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two and Seven Eighths** percentage points ( **2.8750**%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.2500**% or less than **4.2500**%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **12.2500**%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the

**Form 3522 1/01**

ITEM 5748L2 (0711)

GreatDocs™
*(Page 2 of 5)*

Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

#### (A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of            **15**          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     **5.0000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

#### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

#### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

#### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

#### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 8.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:



(A)  Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower has executed and acknowledges receipt of pages 1 through 5 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
**James M. Strefeler**                -Borrower     **Julie E. Strefeler**                -Borrower

_____ (Seal)          _____ (Seal)
                                      -Borrower                                           -Borrower

_____ (Seal)          _____ (Seal)
                                      -Borrower                                           -Borrower

*[Sign Original Only]*

Form 3522 1/01

ITEM 5746L5 (0711)

GreatDocs™
*(Page 5 of 5)*

## BUCKS COUNTY RECORDER OF DEEDS
### 55 East Court Street
### Doylestown, Pennsylvania   18901
### (215) 348-6209

Instrument Number - 2016069768
Recorded On 11/7/2016 At 12:15:54 PM                    * Total Pages - 4
* Instrument Type - MORTGAGE ASSIGNMENT
Invoice Number - 834895              User -  TLF
* Mortgagor - NATIONAL PENN BK
* Mortgagee - BRANCH BKG & TR CO
* Customer - LEWIS RICE L L C
* FEES

```
RECORDING FEES          $67.00
TOTAL PAID              $67.00
```

Bucks County UPI Certification
On November 7, 2016 By JJK

This is a certification page

# DO NOT DETACH

This page is now part
of this legal document.

RETURN DOCUMENT TO:
LEWIS RICE L L C

I hereby CERTIFY that this document is
recorded in the Recorder of Deeds Office
of Bucks County, Pennsylvania.



Joseph J. Szafran, Jr.
Recorder of Deeds

* - Information denoted by an asterisk may change during
the verification process and may not be reflected on this page.



Prepared by and after recording return to:
Lewis Rice LLC
10484 Marty, Overland Park, KS 66212
(913) 648-6333

#■■■■■■■■

Loan No. ■■■■■ / James M. Strefeler and Julie E. Strefeler
MIN ■■■■■■
MERS Phone: ■■■■■■

# **Assignment of Real Estate Mortgage**

KNOW ALL MEN BY THESE PRESENTS:

That the undersigned, **Mortgage Electronic Registration Systems, Inc. (MERS) as nominee for National Penn Bank, its successors and assigns**, mortgagee or assignee of that certain mortgage executed by James M. Strefeler and Julie E. Strefeler, which is recorded in the office of the Recorder of Deeds in and for Bucks County, Pennsylvania, at Book 5724, Page 211, at Instrument No. 2008022057, on March 11, 2008 of the records of said office, have, for value received, sold, assigned, transferred, and set over the said mortgage unto:

Branch Banking & Trust Company
P.O. Box 1847
Wilson, NC 27894

the note therein described and secured thereby having been duly endorsed to the said assignee.

The property encumbered by said mortgage is described as follows:

**See attached Exhibit "A"**

WITNESS my hand this __5__ day of __October__ , 2016.



**Mortgage Electronic Registration Systems, Inc.
(MERS) as nominee for National Penn Bank, its
successors and assigns**

By: _Heather P. Young_

Printed Name: _Heather T. Young_

Title: _Assistant Vice President_

Witnesses:

Signature: _Brandy Evans-Best_

Printed Name: _Brandy Evans Best_

Signature: _N. Dg_

Printed Name: _Nick Doughty_

## CORPORATION ACKNOWLEDGMENT

STATE OF _North Carolina_

)SS

COUNTY OF _Wilson_  )

    On this _5th_ day of _October_ _____, 2016, before me, a notary public,
appeared _Heather T. Young_ _____, to me personally
**Mortgage Electronic Registration Systems, Inc. (MERS) as nominee for National Penn
Bank, its successors and assigns,** and that said instrument was signed on behalf of said
corporation    by    authority    of    its    Board    of    Directors,    and    said
_____ _AVP_ _____ acknowledged said instrument to be the free act and
deed of said corporation.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal at
my office in _Wilson_ _____, _NC_ _____.

_Kenya S. Harper_, Notary Public

My Commission Expires:
_January 29, 2017_

> **KENYA S. HARPER**
> Notary Public, North Carolina
> Wilson County
> My Commission Expires
> January 29, 2017

R

# EXHIBIT 'A'

ALL THAT THAT CERTAIN messuage and tract of land together with the dwelling now there erected situate in Richland Township, Bucks County, Pennsylvania, more fully described on the Final Plan of Subdivision of lands of Corporation Hilltop as prepared by Urwiler & Walter, Inc., Sumneytown, Pa., dated July 29, 1974, last revised July 25, 1975 and recorded September 11, 1975 in plan Book 137 page 9, more fully bounded and described as follows, to wit:

BEGINNING at a point on the center line of Rocky Ridge Road LR 09114 (ultimate width 50 feet wide) said point being South 07 degrees 32 minutes 30 seconds East 706.88 feet from the point of intersection of the center line of Rocky Ridge Road, aforesaid with the center line of Paletown Road, LR 09083 (Ultimate width 80 feet wide); thence in and along the said Rock Ridge Road, South 07 degrees 32 minutes 30 seconds East 135 feet to a point; thence leaving the said Rocky Ridge Road, and running along Lot #2 as shown on said plan, South 82 degrees 27 minutes 30 seconds West 399.72 feet to a point in line of lands now or late of Alex Patafta; thence along same North 25 degrees 24 minutes West 12.38 feet to a point a corner of lands now or late of Charles B. Kaniner; thence along same the following two courses and distances: (1) North 39 degrees 11 minutes East 101 feet to a point; (2) North 25 degrees 19 minutes West 56.67 feet to a point a corner of Lot #4 as shown on said plan thence along same and along other lands now or late of Corporation Hilltop, North 82 degrees 27 minutes 30 seconds East 347.27 feet to the point and place of beginning.

BEING Lot #3 as shown on said plan and that portion of the premises lying between Lot #3 and the center line of Rocky Ridge Road.

COUNTY PARCEL NUMBER ▆▆▆▆▆▆▆

BEING the same premises which Roy Hardwick and Ruth Hardwick, husband and wife, by Deed dated 9/18/1978 and recorded in Bucks County in Deed Book 2303 page 541 conveyed unto James M. Stefeler and Julie E. Strefeler, husband and wife, in fee.

PARCEL ID #: ▆▆▆▆▆▆▆

### BUCKS COUNTY RECORDER OF DEEDS
**55 East Court Street**
**Doylestown, Pennsylvania  18901**
**(215) 348-6209**

Instrument Number - 2017047704
Recorded On 8/9/2017 At 1:13:12 PM          * Total Pages - 3
* Instrument Type - MORTGAGE ASSIGNMENT
Invoice Number - 888378          User - TLF
* Mortgagor - BRANCH BKG & TR CO
* Mortgagee - M T MG L Q INVEST L P
* Customer - SIMPLIFILE LC E-RECORDING
* FEES

| | |
|---|---|
| RECORDING FEES | $67.00 |
| TOTAL PAID | $67.00 |

Bucks County UPI Certification
On August 9, 2017 By TF

## This is a certification page

# DO NOT DETACH

### This page is now part
### of this legal document.

**RETURN DOCUMENT TO:**
MERIDIAN ASSET SERVICES
780 94TH AVENUE NORTH &#10;SUITE
SAINT PETERSBURG, FL 33702

I hereby CERTIFY that this document is
recorded in the Recorder of Deeds Office
of Bucks County, Pennsylvania.



Joseph J. Szafran, Jr.
Recorder of Deeds

\* - Information denoted by an asterisk may change during
the verification process and may not be reflected on this page.

Inst. # 2017047704 - Page 2 of 3

```
CERTIFIED PROPERTY IDENTIFICATION NUMBER(S):
36-039-044--003    -        RICHLAND TWP
       CERTIFIED 08/09/2017 BY TF
```

Prepared By and Return To:
Paul Pugzlys
Collateral Department
Meridian Asset Services, Inc.
3201 34th Street South, Suite 310
St. Petersburg, FL 33711
(727) 497-4650

UPI# ███████████

_____ Space above for Recorder's use _____

Loan No: ███████
Svcr Ln No: █████████
GS ID: ██████

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **BRANCH BANKING & TRUST COMPANY**, whose address is **200 WEST SECOND STREET, WINSTON-SALEM, NORTH CAROLINA 27102**, (ASSIGNOR), does hereby grant, assign and transfer to **MTGLQ INVESTORS, L.P.**, whose address is **6011 CONNECTION DRIVE, IRVING, TX 75039**, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Mortgage: 2/19/2008
Original Loan Amount: $265,000.00
Executed by (Borrower(s)): **JAMES M. STREFELER & JULIE E. STREFELER**
Original Lender: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR NATIONAL PENN BANK, ITS SUCCESSORS AND ASSIGNS**
Filed of Record: In Book/Liber/Volume 5724, Page 211,
Document/Instrument No: 2008022057 in the Recording District of **BUCKS, PA**, Recorded on 3/11/2008.
**MUNICIPALITY: TOWNSHIP OF RICHLAND**

Property more commonly described as: **66 ROCKY RIDGE ROAD, QUAKERTOWN, PENNSYLVANIA 18951**

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: **JUL 2 1 2017** _____

**BRANCH BANKING & TRUST COMPANY, BY MTGLQ INVESTORS, L.P., ITS ATTORNEY-IN-FACT**

_____
By: **DAVE SLEAR**
Title: **VICE PRESIDENT**

Witness Name: **Michael Franco**

I hereby certify the precise address of the within named **MTGLQ INVESTORS, L.P.** (*Assignee*) is **6011 CONNECTION DRIVE, IRVING, TX 75039**.

Inst. # 2017047704 - Page 3 of 3

A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF
THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE
TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

State of        **TEXAS**
County of     **DALLAS**

On  **JUL 2 1 2017**    , before me,     JENNIFER LYNNE CARY, a Notary Public, personally appeared **DAVE
SLEAR, VICE PRESIDENT** of/for **MTGLQ INVESTORS, L.P., AS ATTORNEY-IN-FACT FOR BRANCH
BANKING & TRUST COMPANY**, personally known to me, or who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify
under PENALTY OF PERJURY under the laws of the State of **TEXAS** that the foregoing paragraph is true and
correct. I further certify DAVE SLEAR, signed, sealed, attested and delivered this document as a voluntary act in my
presence.

Witness my hand and official seal.

(Notary Name):  JENNIFER LYNNE CARY
My commission expires: ___**NOV 2 0 2018**___

JENNIFER LYNNE CARY
Notary Public, State of Texas
Comm. Expires 11-20-2018
Notary ID 130032409